NATIONAL HAND TOOL CORP., PLAINTIFF *v.*
UNITED STATES, ET AL., DEFENDANTS

Court No. 89–11–00636

(Decided April 27, 1992)

*Skadden, Arps, Slate, Meagher & Flom (Rodney O. Thorson)* for plaintiff.
*Stuart M. Gerson,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, United States Department of Justice (*Barbara M. Epstein*), for defendants.

### MEMORANDUM OPINION

DiCARLO, *Chief Judge:* Plaintiff, National Hand Tool Corporation, challenges the denial of its protest concerning the country of origin

marking of the articles it imported from Taiwan. The articles involved are nine kinds of components of mechanics' hand tools which plaintiff further processed and assembled in the United States. The Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (1988). At issue is whether the imported articles underwent substantial transformation in the United States, exempting plaintiff from the country of origin marking requirement under 19 U.S.C. § 1304 (1988). The Court finds that the name, character or use of the merchandise did not change by post-importation processing, and no substantial transformation occurred. Customs properly required the merchandise be marked with its country of origin.

## BACKGROUND

Although the parties agree to what processes were involved, they disagree as to whether the processes amounted to a substantial transformation of the imported articles. By stipulation of the parties and the findings of fact, the processes involved in plaintiff's operation are as follows.

Plaintiff imported hand tool components which it used to produce flex sockets, speeder handles, and flex handles. These tools are used for tightening and loosening nuts and bolts. The components were either cold-formed or hot-forged in Taiwan into their final shape before importation, except for speeder handle bars (Ex. F) which were reshaped by a large power press after importation. The grip components of flex handles (Exs. G & H) were knurled in the United States by turning the grip portion of the handle against a set of machine dies that formed a cross-hatched diamond pattern. This pattern affords a comfortable, safe gripping surface.

Some of the articles (Exs. A, B, F, G & H) were heat-treated in the United States while others (Exs. C & E) underwent heat treatment in Taiwan. The heat treatment is a multi-stage operation in which the articles are heat treated, oil-quenched and tempered. The heat treatment strengthens steel by carburization to meet Federal and American National Standards Institute (ANSI) specifications. The carburization process strengthens the surface of steel by increasing its carbon content. After heat treatment, components are cleaned by sand-blasting, tumbling and/or chemical vibration to prepare their surfaces for electroplating. The cleaning process for some articles was performed in Taiwan while others were cleaned after importation.

Next, the articles were electroplated with nickel and chrome to resist rust and corrosion. Nickel-chrome plating consists of layers of nickel measured in the increments of one ten-thousandth of an inch and chrome measured in the increments of one millionth of an inch. The nickel and chrome do not chemically combine with the alloys of the steel, and, hence, the electroplating process does not change the chemical structure of the steel. Some articles (Exs. A, B, C, F, G & H) were electro-

plated in the United States while other articles (Exs. D, E & I) were electroplated in Taiwan.

The handle components of flex handles (Exs. G & H) were marked with a trademark and size after the electroplating process.

After the post-importation processing was completed, various components were assembled to produce plaintiff's flex sockets, speeder handles and flex handles. The assembly operations were manual and required some skill and dexterity to put components together with a screw driver. A flex socket (Ex. L1 or L2) was assembled from a tang end of flex socket (Ex. C) and a drive socket (Ex. A or B) with a connecting block, two pins and two tension springs.

A speeder handle (Ex. K) was combined with a spring-loaded ball in an operation called "stagging" or "staking" in which a spring-loaded ball was inserted into the cavity at the end of the handle component (Ex. F), and the cavity was then partially closed. The handle was then assembled with a knurled grip component (Ex. D or I) with one pin and one spring.

A flex handle was assembled from a lug, or "G-head" (Ex. E), and a handle component (Ex. G or H). A spring and a ball were inserted in the lug by a "stagging" operation and assembled with the handle with a threaded fastener screw and a tension spring.

The Court found that pre-importation processing of coldforming and hot-forging required more complicated functions than post-importation processing.

Both parties also presented evidence concerning the value of the articles at the time of importation and the value added in the United States. Three different formulas were suggested as a basis to determine value added after importation. Plaintiff presented data comparing the invoice value of the imported articles with its sales price to customers. Plaintiff also presented the data comparing the material cost and the manufacturing cost in the United States. Defendants presented the witness who compared manufacturing cost of plaintiff with another company in the same industry.

## Discussion

The statute requires:

> [E]very article of foreign origin * * * imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article * * * will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article.

19 U.S.C. § 1304(a) (1988). However, when the imported article is substantially transformed, marking is not required pursuant to 19 C.F.R. § 134.35 (1991), which provides:

> An article used in the United States in manufacture which results in an article having a name, character, or use differing from that of the imported article, will be within the principle of the decision in the case of United States v. Gibson-Thomsen Co., Inc., 27 C.C.P.A. 267 (C.A.D. 98). Under this principle, the manufacturer or

processor in the United States who converts or combines the imported article into the different article will be considered the "ultimate purchaser" of the imported article within the contemplation of [19 U.S.C. § 1304(a)], and the article shall be excepted from marking.

Customs determined that plaintiff's imported articles were not substantially transformed and required individual article be marked to indicate the country of origin. Customs' determination in a marking case is presumptively correct, and the party challenging the determination has the burden of proving otherwise. 28 U.S.C. § 2639(a)(1) (1988).

"To determine whether a substantial transformation of an article has occurred for purpose of ascertaining who is the 'ultimate purchaser' each case must be decided on its own particular facts." *Uniroyal Inc. v. United States*, 3 CIT 220, 224, 542 F. Supp. 1026, 1029, *aff'd*, 1 Fed. Cir. (T) 21, 702 F.2d 1022 (1983). Based on the trial testimony, the Court finds that the name of each article as imported has the same name in the completed tool. For example, when the lug, or "G-head", component of flex handle imported from Taiwan (Ex. E) was shown, plaintiff's witness called it a "G-head." When the government counsel asked the name of the part where the lug component is attached to a completed flex handle (Ex. J), the witness also called it a "G-head."

"Character" is defined as "one of the essentials of structure, form, materials, or function that together make up and usu[ally] distinguish the individual." *Webster's Third New International Dictionary* (1981). Plaintiff urges the Court to find change in character due to the heat treatment which results in a metallurgical change of the surface of the articles. The Court finds that the character of the articles remained unchanged after heat treatment, electroplating and assembly. Here, the form of the components remained the same since each component was either hot-forged or cold-formed into its final shape in Taiwan, except for the speeder handle bars.

Plaintiff's expert witness, a metallurgist, testified in detail about the functions and effects of heat treatment. The heat treatment is necessary to make the components conform to Federal and ANSI specifications. He testified that the strength of the components is not uniform, with only 50% of the components meeting the specifications before the heat treatment. After the heat treatment, all components meet the specifications. The heating process changes the microstructure of the material, but there was no change in the chemical composition of the material. Although the microstructural changes pointed out by plaintiff's witness may amount to the changes in characteristics of the material, they do not change the character of the articles. The Court finds that there was no substantial change in the character of the articles.

The use of the imported articles was predetermined at the time of importation. Each component was intended to be incorporated in a particular finished mechanics' hand tool, except for Exhibit C which has dual use either as a part in a universal joint or a flex socket. For example,

Exhibit F was intended to be used as the speeder handle bar and was in fact used as speeder handle bar in the finished tool. There was, therefore, no change in use as a result of processing performed in the United States.

The fact that there was only one predetermined use of imported article does not preclude the finding of substantial transformation. *See, e.g., Torrington Co., v. United States*, 3 Fed. Cir. (T) 158, 764 F.2d 1563 (1985). However, the determination of substantial transformation must be based on the totality of the evidence. *See Ferrostaal Metals Corp. v. United States*, 11 CIT 470, 478, 664 F. Supp. 535, 541 (1987); *National Juice Prods. Ass'n v. United States*, 10 CIT 48, 61, 628 F. Supp. 978, 991 (1986). The evidence shows that there was no substantial change in name, character or use. Considering all the evidence, the Court is compelled to find under the circumstances that there was no substantial transformation of the articles imported from Taiwan.

Plaintiff also urges the Court to compare the processing involved in this action with the steel galvanization process which the Court found to be substantial transformation in *Ferrostaal Metals*. The products and processes involved in *Ferrostaal Metals* and the case at bar are totally different. In *Ferrostaal Metals,* the Court examined the imported cold-rolled steel sheet which underwent continuous hot-dip galvanizing process. The Court found that the character of the product transformed a strong, brittle product into a durable, corrosion-resistant product which is formable for a range of commercial applications. 11 CIT at 477, 664 F. Supp. at 540. Furthermore, there were a variety of end uses of the continuous hot-dipped galvanized steel sheet while the cold-rolled steel had very few uses. *Id.* at 477, 664 F. Supp. at 541. In *Ferrostaal Metals*, unlike this case, the Court found there were changes in name, character and use which resulted in substantial transformation. *Id.* at 478, 664 F. Supp. at 541.

Plaintiff also argues that the value added in the United States was relatively significant compared to the operation in Taiwan so that substantial transformation should be found. *See, e.g., National Juice*, 10 CIT at 60, 628 F. Supp. at 990. The Court does not agree. For example, plaintiff urges the Court to compare the invoice purchase price of the imported components with the proportionate value of components in its sales price of finished tools to the customers in the United States. Plaintiff argues that all its costs plus profits should be considered as the value added to the imported product. This could lead to inconsistent marking requirements for importers who perform exactly the same processes on imported merchandise but sell at different prices. To avoid such ludicrous results, the substantial transformation test utilizing name, character and use criteria should generally be determinative of the requirement for country of origin marking. Based on the evidence, the Court holds that there is no reason to find substantial transformation on the basis of the value added in the United States.

CONCLUSION

Plaintiff's imported articles did not undergo changes in name character or use which resulted in substantial transformation in the United States. Plaintiff failed to rebut the Customs' presumptively correct determination that the imported article must be marked "Taiwan." Customs' denial of the protest is affirmed, and a judgment shall be entered for defendants dismissing the action.